We'll move to the second case this morning, Abernathy v. Eastern Illinois Railroad. May it please the court, counsel, Jerry Stocks on behalf of the Eastern Illinois Railroad. The facts in this case, or the issue presented, is can FELA liability be established merely by proof that an alternative method of doing the work that may be automated or safer could be available? Now, it was not available and had not been available for four years, and two methods of doing the work were available. It is the position of the railroad that there was no evidence that those two available methods to perform the work were inherently unsafe, or that there was any evidence where the railroad would reasonably anticipate harm or injury from the use of those available alternatives, which here was the use of a backhoe, the method actually used to transport railroad ties to a field crossing repair in a farmer's field. Also available were pickup trucks that could have been used to transport the railroad ties to the work site. Rather, the allegations in the case are you should have had a tie crane railroad so that the ties would never be traveling on a public roadway. The tie crane that had been owned or was owned by the railroad hadn't operated for four years. The work that Mr. Abernathy was performing was work he had done before. He had lifted railroad ties before. The lifting of railroad ties was, while may not be frequent, but was a regular job duty that he would engage in his employ as a track inspector and a track repairman. His task on this day was to deliver railroad ties or transport them to the job site. However, he was not injured in the course of the transport. In the course of the transport, a tie dumps out of the bucket. When Mr. Abernathy loaded the bucket with his co-worker, the ties were stable. Neither Mr. Abernathy nor his co-worker saw any reason or any notice that there was an unsafe load or an imbalanced load. The tie during transport on the public roadway ejects from the bucket. And he is then injured while lifting with his co-worker one railroad tie, approximately 70 to 100 pounds. Is there evidence that they can be as much as 220 pounds? There was an estimate, but the evidence of what these ties weighed coming from the railroad would weigh them. We're here on a jury verdict. We're not re-weighing evidence. You're asking for JMOL. Was there evidence that they were 220 pounds? That would be the outside range. I would submit that that was not personal knowledge evidence. The personal knowledge evidence put it closer to 150 pounds. However, even in that range, there is no allegation of negligence charged in the complaint or even raised in the evidence of trial that the act of lifting, the technique used, and the actual injury-producing activity was in any way negligent, that the training of the railroad employees was in any way negligent. Did Abernathy complain of the risk of injury that the crane's absence brought? No, he did not complain of any risk of injury. What he complained is that we have a tie crane that you have not repaired for four years. It would make my work easier, but he did not. And I think this is a significant distinction. In his prior complaints, he never complained that the methods actually available were unsafe, that is, using a backhoe to transport tie cranes. He never complained. That was the trial theory, though, right? Our defense was certainly built upon the absence of evidence that the methods actually available were inherently unsafe. And in the absence, we start with the proposition that there is no duty to provide the most automated or the safest method of doing the work. Rather, the focus must be, is that which actually was made available by the railroad inherently unsafe and such that you reasonably would anticipate harm or injury from the use. The concept of inherently unsafe is a product liability concept. We're just in the straight-up negligence, duty to provide a safe workplace kind of domain here. And the theory of the plaintiff's case, as I understand it, is that the tie crane method, which would better secure the ties and permit their transport on the rail line as opposed to the public ways, was the safe route, and the others were more dangerous. Not inherently unsafe, but more dangerous, more at risk of the ties falling off on the public way and having to be manually lifted. That's the theory of the plaintiff's case. That's the theory of the plaintiff's case. And that is indeed what happened here, and that's when the injury occurred. Except that the breach of duty in an FALA case is not measured by a relative danger comparing an alternative method. Is evidence of a different, safer method relevant? Is it admissible? It is relevant if the preliminary fact or the antecedent fact, and there's some evidence to show that those methods actually available were unsafe. I use inherently unsafe because it comes from justice. These are all relative concepts, right? They are all relevant concepts. Safety here is not an absolute notion, right? Safety, you cannot support the FLA verdict merely by a general duty to be safe. I understand. Well, there is a general duty to be safe, but it has to be reasonable. I understand your point is there's not a duty to make it as safe as humanly possible, but given that there are different levels of risk apparently associated with these different methods, why is this not just a jury issue? Because there must be evidence, and this is the McBride case that I rely on most readily, or the Walker case, which informs essentially our appeal and the template for our argument, is that there has to be evidence that the defendant recognized that there was a reasonably anticipated. Who is Mr. Fletcher? Mr. Fletcher is the president of the Eastern Illinois Railroad. And what was he talking about when he testified, I didn't do my job? There was an antecedent to that question that if I was required to have a tie crane, I then would not have done my job. But it still begs the question, was he required to have the tie crane, which then leads to the issue, was there a duty to have the safest and most automated method, which we submit the Taylor case, the Stillman case, and the authority, even the Walker case cited in our brief, is that there is no duty to have the safest method if those methods available were safe. Would you agree that there is at least some inherent risk in lifting manually objects that weigh 150 pounds or more? With two people lifting in accordance with their training, it is a risk that is ordinary in their job description and what they do. That is not sufficient. So there is an inherent risk in that? Pardon me? There is an inherent risk in that? There's a risk any time someone bends down to pick something up, and certainly as weight gets greater, that risk logically increases. Mr. Stocks, may I ask you, how many separate reversible errors do you think the district judge made in this case? We have three assignments essentially in our- Independently reversible grounds. The tie crane, the denial of the judgment as a matter of law when there was no evidence of a defect in the equipment actually available, or the- My count was about eight or ten. Is that right? In the course of our brief, no, there would be three in the new trial motion. There would be two components to the JMOL, which in the first instance is there was an absence of proof that the pickup truck transport was reasonably anticipated to lead to misappropriate harm, that the backhoe, that there was any evidence to support that the railroad would have had notice of any reasonably anticipated misappropriate harm. And then we have an approximate cause contention. Let me go. So what's the count? Well, three trial rulings and three components to the- Just three. So it would be six counting the evidentiary rulings. Okay, I'd count it a little higher, but all right. But with regard to what is necessary, just to talk about the Walker case, which we think is very similar in terms of facts where there were available methods of lifting equipment that they were working on that were not used. The employees, in accordance with their training, including the plaintiff, working together lifted the equipment and had a resulting injury. Summary judgment was granted in that case because the lifting was part of a duty they had done regularly and that the method of lifting was not either alleged or shown to be negligence on the part of the railroad, that that was not sufficient to sustain the case, merely because alternative lifting or automated lifting was available. We think the same analogy and the same reasoning would apply to the instant case. And as in the McKinnon case that we also cite, and others in our brief, where when the scope of what you're doing is what's in your ordinary and regular duties and you're doing it non-negligently, because here it wasn't the transport that injured. It was the actual lift for which there is no allegation of negligence that directly produced the injury. Well, the lift became necessary because the mode of transport was hazardous because the backhoe wasn't the appropriate vehicle because of the necessity of taking it on the public ways and the likelihood that ties would fall off. Well, I don't, what evidence is there that there was a likelihood that ties would fall off? That's part, the railroad was on no notice that this was anything but a proper use of the backhoe. They had a history of use without incident. We have the employee and the plaintiff using it who concluded the load was stable and had no reason to believe anything would occur. We had the only expert testimony in the case testifying that this was a reasonable and customary method in the rail repair industry for transporting railroad ties. It's transitioning not from a case of any notice, any true indicia of a negligent act on the part of the railroad and pushes us to the end of the continuum where we are a guarantor for anything that goes wrong during that transport. I thought the expert testified that a flatbed, if the ties had to go on a public roadway, that a flatbed was needed. Not was needed, but was an option that would be used. But he testified that the use of a backhoe to transport railroad ties was a customary use in the industry. Didn't he say that when he does this, he uses automated equipment to handle the ties? No, he said he uses a flatbed truck when he was going a distance. And then does what to actually move the ties off and on the truck? If they have a, they will use a backhoe. They will in times of bigger projects, they will use. Didn't he say he would use automated equipment rather than manual lifts? If he had it, but he also, and a backhoe is automated equipment for inserting ties. But they did not have a tie crane. Now the expert in his rail repair industry did not have a tie crane, so they weren't using a tie crane. The backhoe was needed to do the work, even once you got to the job site. Our point is that we are being held, essentially as the guarantor, strictly liable because we have no notice. Nothing that would support that we anticipated. No evidence that we would have anticipated that a tie would spill on the roadway, let alone would harm someone. The tie spilling on the roadway did not harm. It presented the occasion as to where the tie would be lifted. Not how or what was being lifted or how they did it. And that occasion was not a direct, did not directly produce the injury. Well isn't that a question of proximate cause, which really isn't an appropriate element of a FELA claim because the causation standard is so loose? The causation standard is quite loose, undeniably, in an FELA claim. But there is, as the McBride case would show, there is a very thin or needle that would need to be thread based on the liberal view of FELA causation. But here, since the direct cause is not even alleged to be negligent, there's no fact dispute that the direct cause of this injury was lifting the tie. And since causation, occasion and cause, are actually defined terms, as we cited, that the cause is what produces the injury, which tracks with the language from Rogers. What is the act that produces the injury? While an occasion is what sets the circumstances within which or the occasion for that direct cause to operate. Now true, that is recognized in standard negligence, non-FELA negligence proximate causation analysis. But we submit it as not antagonistic to what Rogers has laid out, is that it needs to be a cause producing the injury. The transport did not produce this injury. It presented only by fortuity where the lift would occur. But the cause and fact test under FELA claims is whether the employer negligence played any part, even the slightest, in producing the injury. I mean, that's a really light touch causation analysis. Even the majority in the McBride case found that there has to be some logical limit to but-for causation. It cannot extend limitlessly. In this case, we have a non-negligent lift that occurred on a roadway. Now keep in mind, there was nothing about the roadway that caused this lift to be performed any differently than they did it at the yard 10 minutes earlier. Sir, may I ask, what was the 30% of fault attributed to Mr. Abernathy for? One would assume that allegations were. What argument did you make? The way he drove the backhoe, that there was a high-speed drive of the backhoe, that he developed road bounce with the backhoe. And in response to what's in their brief, that fact, that comparative fault, is not a basis to impart notice upon the railroad. Because that would be imposing a duty for the railroad to anticipate the negligence of a third party. A third party? The plaintiff here. The plaintiff would be, do we have to anticipate his negligence when we had never had an incident like this? You do with respect to genuine third parties, correct? With responding to superior liability, right? Well, in this context, it would be Mr. Abernathy. We had no notice or reason to expect that he would operate the backhoe as he described. And so from that perspective, again, we're being made a guarantor for something we had no notice of. I think you're arguing the duty question at a level of specificity that FELA law does not require, or ordinary negligence law for that matter. It's reasonable foreseeability of a risk of harm. And the theory of the plaintiff's case here is that the tie crane was made unavailable by the employer's own choice to not repair it or replace it, and that this other available alternative to transport the ties had carried unreasonable risks. And that's negligence, assuming the jury concluded, which it obviously did, that those risks were foreseeable to a reasonable person. Absent evidence that there, and this is based on the FELA cases, that there was a reasonably anticipated harm that would result in injury, we have no evidence that there was ever any issue with the backhoe or pickup trucks. That's a level of specificity that is not required by even standard negligence law. I mean, the foreseeability is not directed at the specific injury that ultimately occurred. That's a proximate cause kind of argument. That's a Mrs. Palsgraf argument. Well, you have no breach of duty without notice. You cannot, because then you have rendered a tort law into a guarantee setting, where you're just the guarantor of whatever happens when they're in the course of employ, or in the course of any activity that you have that relationship with them. But you have to have notice. Every FELA case across the board says there must be notice to the employer of the anticipated harm, and it's lacking on this record. Thank you. That concludes my remarks. Thank you, counsel. May it please the court. I am Michael Bloedfogle. I'm here on behalf of Marvin Abernathy. I want to start by going to the notice evidence, because it was a little stronger than counsel let on. Plaintiff's testimony at trial was in regard to reporting the absence of a working tie crane to Tim Allen. I bet I told him 20 times at least. That's from the transcript, page 220, document 89. Then he goes on about how unsafe our work was going to be if we have to do it with the ties and stuff. It was a safety issue and needed to be fixed. That is discussed on page 8 of our brief. On page 9, we note that Allen, who is a manager for the railroad, acknowledged plaintiff complained about safety maybe two or three times. That's a quote. Then, quote, that I recall, unquote, when he asked for a tie crane to get replaced. And then Fletcher, who's the president, acknowledged there were, quote, unquote, many discussions between him and Allen about whether a tie crane should be replaced before a plaintiff was injured. And his admission, the full quote is, I didn't do my job because I'm the one that said we're not going to repair or replace it. Now, that leads into the Walker case. That is the case principally cited by counsel in his argument. Walker, when it affirmed summary judgment and distinguished this court's Harbin case, stated, well, the differences, the plaintiff in Harbin showed evidence of the railroad's negligence through its disregard of complaints made by the employees. I just read to you complaints made by the employee that the management at this company admitted receiving. The other distinction Walker made was, additionally, in Harbin, the plaintiff showed the availability of alternative methods and safeguards that would ensure employee safety. Here, we have a tie crane that everyone acknowledges the railroad had. It had just become inoperable in 2008 and remained inoperable all the way through 2012. Now, I think there are a few other arguments I'll address and a few larger scale points I'll make. As the court pointed out, the reason it was not reasonably safe to rely on the backhoe or pickup trucks is because the ties are not as secure with that method. They are on the public roadways instead of just being on the railroad tracks. They have to be manually lifted. The public roadway is very important because one of the points counsel wants to make is he wants to limit liability to the actual act of lifting the ties. Now, I think that's too narrow for all of the reasons said forth in the briefing. But even if you just look at the event, one of their allegations of comparative fault that they raised not just at trial, during plaintiff's case in chief, before they moved for direct divert, but also in their briefing is they say, well, plaintiff, you should have called back to the railroad once the ties spilled. You should have called Tim Allen or you should have called other employees about this hazard. Well, the reason they couldn't just wait for other employees to come in and help them clean up the ties that had fallen on the roadway is because these ties were on a public roadway. As we cite in the brief, that is plaintiff's testimony. We had to lift them right then and there because they were on a public roadway. They were creating a public hazard. The evidence of comparative fault that they were presenting was in the case from the beginning. That is one of their allegations was you should have waited for other people to come help you. Another one, and they cite this in their principle brief and they cite this in their reply brief, is they kept saying, well, you should have used a pickup truck instead of a backhoe. Well, perhaps that's where the jury came up with 30% comparative fault. Plaintiff had plenty of testimony why that was not practical in that there were lots of other materials already in the pickup truck. And if you load all the ties, now your pickup truck's over capacity. But if the jury believes plaintiff was at fault for not using the pickup truck, they might also have noted the evidence was that Alan, the manager, had never told plaintiff not to use the pickup truck, that Alan was aware the plaintiff often was using the backhoe in the yard. There was no training of plaintiff telling him he had to use the pickup truck. There were no rules promulgated saying you have to use the pickup truck. That would be a separate reason the jury could find the defendant liable. And there was no flatbed truck available, which was apparently the defense experts' goal of choice. Exactly, exactly. There are plenty of bases for how the jury could have gotten to the verdict they got. And if you look at the closing, this was not a runaway jury. The closing argument, we asked for $1,500,000 from the jury. That's document 90, transcript page 531. They awarded half of that, then they reduced that by 30% for comparative fault. The jury doesn't know what the effect of the comparison is on the ultimate recovery. Actually, I believe I'd have to look at the verdict form again, but I think on that verdict form in the central district,  Oh. Yeah. I would have to check the short appendix to be sure, but I think that's what I saw just last night looking at this. But getting to the larger points, their causation argument would be much more, I mean, it essentially seems to be the dissent from the McBride case. The majority in McBride, at length, discusses why traditional formulations of proximate cause are not appropriate in FELA cases due to the statutory language. One of the cases McBride cites a few times is the Ferguson case that we cite in our briefing. The Ferguson case is the case, it's a Jones Act case, but the Jones Act incorporates FELA, where a seaman was injured because he was trying to retrieve ice cream. The ice cream scoop wasn't strong enough to get the ice cream out because the ice cream was frozen, so he used a butcher knife and lost two fingers using the butcher knife, and the US Supreme Court said that's close enough for causation under the FELA. And until I reread McBride, I thought, well, maybe that's just a case from the 50s, and we'd never get there again. McBride cites it favorably a few times, a 2011 FELA case. That is still the law. If that is enough for causation, this case clearly falls within the range of appropriate causation. McBride also discusses what the Missouri Supreme Court did in Rogers as the example of what not to do with causation. It discusses the facts of Rogers at length. In Rogers, the plaintiff said the railroad was negligent in failing to maintain a flat surface in any FEL, which is fairly conventional. But what actually happened is the plaintiff fell while attempting to escape flames that were set off by a passing train after he had been assigned to burn off some vegetation and weeds. The Missouri Supreme Court said that is too attenuated for causation. The US Supreme Court in Rogers said, no, that is fine under the FELA. And McBride, of course, endorses Rogers and why the Missouri Supreme Court was wrong. On traditional causation principles in the reply brief, they rely on a case called Pennsylvania Railroad Company versus Indiana Harbor Belt Railroad Company, a 7th Circuit case from 1958. But the problem is that is not an FELA case. That was a case interpreting an indemnification clause between two railroads. And it actually stated it was talking about traditional approximate cause principles. It refers to inordinary usage when it's discussing how the distinguished causes and occasions. It cites Illinois common law cases within that decision. And even those Illinois cases, even if we're in the common law, they don't just say occasion but not cause. They say an occasion could insulate a defendant from liability if that condition caused injury by the subsequent independent act of a third person, then that condition would not be approximate cause if the subsequent act is an intervening, efficient cause which breaks the causal connection. That is Illinois common law on this point. We don't even have that breaking the causal connection here. We don't have a third party acting. We have an employee doing his job. No one is stating that what the plaintiff did at any point was outside the course of his employment, even if they're calling it comparative fault. No one is saying that was somehow an intervening cause or a supervening cause. And more importantly, coming back full circle, McBride says all those traditional formulations are out the window in FELA because the statutory text simply says you look to whether it was cause in whole or in part. That's the statutory language. That's why there's the departure from the common law. Unforeseeability. Their view on foreseeability has been rejected for decades. And as the court mentions, their view would be improper even in a common law case. But in FELA cases, Gallick and numerous other cases well stated that so long as any kind of danger is out there, that is sufficient. They do not have to foresee the precise manner in which the injury occurred. They don't have to foresee the extent of the injuries that could be incurred from their danger. It is enough if they have actual or constructive notice of a danger. And a reminder, the plaintiff told them, he testified more than 20 times, there is a danger to employee safety by you not using the equipment for this job. Touching briefly, I think on the new trial issues, they're covered extensively in the briefing. But the only two issues they raised in the briefing, as I can tell, distinct issues are, they stated that their expert should not have been made to testify what he knew about ADM. It was an in limine ruling. In limine rulings are interlocutory. We had a sidebar conference outside the presence of the jury where their only argument at that point essentially was they were worried about the prejudice of ADM being in the case and they thought the court's in limine ruling was controlling. As we pointed out, their experts, his company's number one customer was the parent of the defendant. So that evidence was relevant to bias. And to the extent they were worried the jury was going to conflate his company's expenses and budget with ADM's, they cured in a year by putting Mr. Fletcher back on the stand who testified about the separate budget of that railroad. The other arguments they raised in their post-trial motion and on appeal were not raised at the sidebar, so the judge had no opportunity to correct them. As the judge pointed out, to the extent they're claiming we didn't get to talk about ADM and jury selection, neither did plaintiff. And there's certainly no, that testimony was a few minutes in a multi-day trial. The trial court found it was harmless error, and the trial court's in a best position to make that call. And what was Mulvaney, the expert's relationship to ADM? He was, let me... I believe his company's number one customer was ADM, but let me make sure I've got that right. This goes to the bias question. Yes. His company's biggest client was ADM, and then ADM is the parent company to the railroad. So he acknowledged that his company's biggest client was ADM. He acknowledged that he was aware of some kind of relationship between ADM and that company, but he denied knowing that ADM was the parent company. And then Fletcher admitted that, yes, ADM is our parent, our corporate parent. The only other issue that I can think of evidentiary was the testimony by Allen about his use of a pickup truck when it was over capacity. And again, two points. I guess, number one, on the substance, it's relevant, because they brought in Allen to testify about what capacities the pickup trucks were, and make their point of plaintiff should have used the pickup truck, not the backhoe. Once he gave that testimony, it's clearly relevant to show he's giving this testimony without understanding what the capacities are of pickup trucks, and, in fact, he'd actually used pickup trucks over capacity. It's clearly relevant. And beyond that, by the time they've objected, all of the substance of that testimony has already come in. They objected to a rather conclusory question about, so this means you actually used a truck when it was over capacity, but all the component facts setting up that question were in evidence without objection. So they waived it, and also, again, it would be harmless error. The judge found that couldn't possibly have influenced the verdict, and, again, the truck works in the best position to make that call. I think the briefing clearly sets out that their positions on the law are simply wrong. The jury heard all of the evidence. They are not contending the jury was improperly instructed. In fact, the jury was properly instructed on what plaintiff has to show for negligence and for causation. The jury reached a verdict. It was not a runaway jury by any means. It was a 70-30 split by the jury. And, again, the evidence the railroad used throughout trial to try to prove comparative fault could also have been found by the jury as evidence of the railroad's fault as well for its failure to train and its failure to promulgate and enforce rules. Unless there are any questions. We have the issue of the expert witnesses. The plaintiff's bill of cause. Oh, thank you, thank you. Yes, so the 2.8 U.S.C. 1821 says costs are limited, but then it has the phrase, except as otherwise provided by law. This court, in the Holasa case, stated that Rule 26 fits that otherwise provided by law. So, in other words, the cost of an expert's deposition could be ultimately recovered as cost. The trial court's disposition of this issue was, well, plaintiff, you asked for these depositions for which you're seeking cost from defendant, so, therefore, you cannot tax those as cost against the defendant. And there's no basis within Rule 26 for that distinction. And the point we make in the briefing that I don't believe defense counsel addresses is there was an Eighth Circuit case just a few years ago, called Stanley v. Cattrell, in which I believe the figure was $900 awarded to Cattrell after a jury verdict for the cost it had to pay to the plaintiff's expert, where Cattrell was seeking the deposition. This would be the identical situation. We need an expert's testimony. We're the ones seeking to procure it. We had to pay to get that expert's testimony, and now we're seeking the cost. Stanley, which relies on this Seventh Circuit's decision in Holasa, states those costs are recoverable. And I think that fits within 2.8 U.S.C. 1821. Was it a straight discovery, or was it as an expert witness? Candidly, it was more used as an evidence deposition, but as we pointed out in the argument below when we had this issue, I think it was May 4th of last year, the federal rules don't actually make that distinction. In other words, they don't say there's a discovery deposition and then there's an evidentiary deposition. The Illinois Supreme Court rules, Rule 212 in Illinois Supreme Court, clearly makes that distinction, but the federal rules do not. An argument below was since there is no distinction, there would be no basis to say you could recover these costs at the first deposition of an expert, but you could not recover them at a second or third. And I believe the record would support this, and this argument wasn't made by the defendant in any event, but there's also evidence that the second and third depositions were occurring after Mr. Abernathy was receiving additional treatment. So to some extent, it would be a mix. I mean, it clearly was being used for purposes of trial, but we're also learning new opinions of the doctor after the doctor has done some intervening medical treatment. But the Rule 26 standard applies to shift the cost to the party requesting the discovery, and here the defense did not request this discovery from the expert, this deposition. That would be Rule 26, but then Halassa and then Stanley seem to say that's who pays the cost initially. Halassa and Stanley seem to say that post-trial, after a verdict, if you incurred those costs in the course of getting your verdict, then you can seek to tax those as costs on the opponent. I think that's a misreading of that case. It just says Rule 26 trumps the $40 flat fee, because it's an otherwise provided by law provision. I think that's certainly part of Halassa, and I think Stanley might reach the next step of, okay, so what happens if the party seeking to tax the cost was the party who sought the deposition in the first place? Right, I think that it's sort of misread Halassa. Yes, and that may well be the court's position. Our position would be Stanley was appropriate, but I think to find it to the contrary, you would have to at least say we think Stanley is incorrect. And the other issue I realize I didn't address, although I think the court's position on this is fairly clear, the defense makes a huge argument about evidence of safer alternatives essentially not being relevant. As the court's questions seem to indicate, evidence of safer methods is often relevant in determining whether or not the railroad discharge is due to provide a reasonably safe work environment. And some of the cases we cite state you cannot just assess the safety of the methods that were used in a vacuum. You have to look to see whether there were other methods available. And in this instance, we're not talking about some futuristic prototype or hypothetical thing that could have been used. It was a tool and equipment that the railroad had used all the way through 2008, and then just left sitting inoperable for four years without even bothering to check how much it would cost to repair it. So that evidence was clearly relevant in support of the verdict. Thank you. Thank you, counsel. You're out of time. Thanks to both counsel. The case will be taken under advisement.